Joe C. PADILLA, Plaintiff,

v.

Dr. Bruce STRINGER and City of
Albuquerque, Defendants.

Civ. No. 10432.

United States District Court,
D. New Mexico.

Dec. 31, 1974.

Toulouse, Krehbiel & Cheney, P. A., Briggs F. Cheney, Albuquerque, N. M., for plaintiff.

Frank Horan, City Atty., Elizabeth N. Love, Asst. City Atty., Albuquerque, N. M., for City of Albuquerque.

Michael M. Rueckhaus, Albuquerque, N. M., for Dr. B. Stringer.

## MEMORANDUM OPINION

BRATTON, District Judge.

Plaintiff is a past employee of the city of Albuquerque Rio Grande Zoo and presently holds the position of gas station attendant in the city vehicle maintenance department. He brings this action on behalf of himself and seeks to represent a class consisting of past, present, and future individuals of Spanish national origin who were, are, or will be discriminated against in their employment at the Rio Grande Zoo. Plaintiff seeks injunctive and declaratory relief as well as damages. Defendants are the city of Albuquerque and Dr. Bruce Stringer, director of the Rio Grande Zoo. Jurisdiction is invoked pursuant to 28 U.S.C.A. § 1343(4) and 42 U.S.C.A. §§ 1983, 2000e et seq.[1]

Dr. Stringer challenges the court's jurisdiction insofar as the plaintiff is proceeding against him individually under 42 U.S.C.A. § 2000e et seq. Sec. 2000e(b) defines an employer as "a person engaged in an industry affecting commerce . . . and any agent of such a person . . . " Accordingly, an individual employee of an employer can be sued for participating in the managerial decisions that constitute the alleged discriminatory conduct. Dr. Stringer in his capacity as director of the zoo is an agent of the city of Albuquerque within the meaning of § 2000e(b).

Dr. Stringer was named individually along with the city as a respondent in the charge before the Equal Employment Opportunity Commission (EEOC), a prerequisite to Title VII discrimination suits.[2] However, the record does not disclose whether a "suit-letter" was ever issued as to plaintiff's claim against Dr. Stringer individually.[3] The letter only refers generally to the EEOC case file, No. YAL3–333, and that file reflects that the EEOC never served notice of plaintiff's charge on Dr. Stringer individually as required by 42 U.S.C.A. § 2000e–5(b). Nevertheless, plaintiff's claim against Dr. Stringer should not be prejudiced because the EEOC inadvertently treated his charge before it as if the city were the only respondent. A plaintiff is responsible only for satisfying the requirement of pursuing his ad-

1. On the court's own motion the 42 U.S.C.A. § 1983 claim against the city was dismissed at the outset of trial. Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

2. Le Beau v. Libbey-Owens-Ford Co., 484 F. 2d 798, 799 (7th Cir. 1973); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719 (7th Cir. 1969); Mickel v. South Carolina State Employment Serv., 377 F.2d 239, 241 (4th Cir. 1967), cert. denied, 389 U.S. 877, 88 S. Ct. 177, 19 L.Ed.2d 166 (1967).

3. Absent special circumstances, notice by the EEOC of the right to sue is a jurisdictional prerequisite to pursuing a discrimination claim here. Stebbins v. Continental Ins. Co., 143 U.S.App.D.C. 121, 442 F.2d 843 (1971).

ministrative remedy placed on him by the provisions of Title VII, and not for omissions by the EEOC. *See* Miller v. Int'l Paper Co., 408 F.2d 283, 290 (5th Cir. 1969); Aros v. McDonnell Douglas Corp., 348 F.Supp. 661, 663 (C.D.Cal. 1972); Foye v. United A. G. Stores Coop, Inc., 336 F.Supp. 82, 83 (D.Neb. 1972); Johnson v. ITT–Thompson Indus., 323 F.Supp. 1258 (N.D.Miss. 1971).

## I.

Plaintiff was first hired by the city on March 9, 1969, as a temporary employee to work part time as a night watchman at the zoo. On April 7, 1969, he became a permanent employee. Two weeks later he was promoted from night watchman to zookeeper I. He received four merit increases with the approval of Dr. Stringer on October 20, 1969, November 2, 1970, November 15, 1970, and October 30, 1972. In January 1973, the plaintiff and three other employees at the zoo sought to fill a zookeeper II vacancy in the hoofstock area. Plaintiff was denied this promotion, and effective May 7, 1973, he sought and obtained a transfer to the city vehicle maintenance department as a watchman.

Dr. Stringer first came to the Rio Grande Zoo as director in August 1968. From then until the date of trial he was responsible for all personnel at the zoo with the exception of a short period from January 29, 1974, to July 15, 1974, when another employee of the city was appointed acting director of the zoo and Dr. Stringer had responsibility for veterinary services.

In addition to alleging a pattern or practice of discrimination against all employees of Spanish origin at the zoo, plaintiff specifically claims discrimination in regard to: (1) his denial of promotion from zookeeper I to zookeeper II; (2) his transfer to the city vehicle maintenance department was coerced as the result of harassment by Dr. Stringer; and (3) the city's job requirement that any employee promoted or placed into a zookeeper position must have a high school diploma or its equivalent works an invidious discrimination against peoples of Spanish origin.

Shortly after plaintiff's employment at the zoo it was discovered by the city personnel department that he had falsified an answer on his application form in that he had neglected to record a past felony conviction. The personnel department notified Dr. Stringer of the past conviction and asked for his recommendation. Dr. Stringer was pleased with plaintiff's work with the birds at the zoo and believed that Mr. Padilla should be allowed to remain. However, the plaintiff was told that the incident might affect future decisions regarding him.

The plaintiff had considerable knowledge about birds before he came to the zoo. Dr. Stringer had given him some eggs from zoo animals to see if he might incubate them. Plaintiff continued to take these eggs after he was employed. Many of them were quite valuable eggs from rare birds. When Dr. Stringer learned that Mr. Padilla was taking rare bird eggs, he accused plaintiff of theft. The testimony was conflicting as to whether Mr. Padilla had permission to take the eggs or had been stealing them and whether he had been selling the eggs to other persons and retaining the proceeds.

In June 1971 a muscle in plaintiff's right shoulder was injured in an accident with an elephant, resulting in surgery and inability to lift heavy weights until use of the shoulder was regained. The injury was the cause of two minor motor vehicle accidents at the zoo in September 1972 because Mr. Padilla could drive with only one hand. Dr. Stringer accused Mr. Padilla of abusing his sick leave privileges at the zoo, but plaintiff maintained that he was only leaving work early to go to a doctor for therapy for his shoulder.

In January 1973 Mr. Padilla and three others sought the promotion to zookeeper II in the hoofstock area. The posi-

tion requires lifting of heavy weights such as feed sacks and bales of hay. At this time Mr. Padilla was still complaining of problems with his shoulder.

As to plaintiff's claim on the behalf of other employees at the zoo, there was conflicting evidence of a number of other incidents, including verbal slurs against people of Spanish or Mexican descent, favoritism in promotions, harassment by assigning less desirable tasks to specific individuals, inequitable treatment among employees as to punishment for tardiness in arriving at work and length of allowed coffee breaks, as well as an alleged attempt by Dr. Stringer to frame an employee for poisoning animals by planting poison in the employee's car. On the other hand, there was testimony concerning improper care of animals, poisoning of animals, acid being thrown on an animal, widespread theft of livestock feed, and possible arson of a building housing the children's zoo during a union strike.

## II.

An issue that must be considered before reaching the merits is the charge that plaintiff has failed to exhaust his federal, state, and local administrative remedies prior to initiating suit in this court.

Plaintiff was first notified by Dr. Stringer that he was being denied his requested promotion from zookeeper I to zookeeper II in the hoofstock area on January 25, 1973. The following day he filed his charge of discrimination with the EEOC. The complaint pertained not only to the denied promotion but to a continuing pattern or practice of discrimination by Dr. Stringer against Spanish origin employees at the zoo. However, the charge did not allege a constructive discharge from the zoo and could not have on that date because Mr. Padilla did not transfer from the zoo to the vehicle maintenance department un-

til May, 1973. Nor did the charge before the EEOC challenge the high school or equivalent job qualification for the zookeeper position. Plaintiff's charge with the EEOC was referred to the Human Rights Commission of New Mexico on January 26, 1973. Without taking any action, the state commission referred the charge back to the EEOC on January 31, 1973.

■ Defendants claim that the plaintiff has failed to exhaust his federal and state administrative remedies as to the constructive discharge and high school job requirement questions, neither of which were raised in the original charge filed with the EEOC or considered by it. However, it is not required that a plaintiff unschooled in the law specifically articulate in the charge he files with the EEOC the full panoply of discrimination he may have suffered. King v. Georgia Power Co., 295 F.Supp. 943, 947 (N.D. Ga.1968). It has not been shown in this action that the issues of constructive discharge and the high school job qualification were not subjects of the conciliation efforts before the EEOC.

As to the Title VII claims against the defendants, the plaintiff has a local remedy under the grievance procedure of a city ordinance.[4] The grievance process of the city's Merit System Ordinance provides an aggrieved employee with a series of hearings and appeals up through the administrative levels with which to prosecute his claim. It is first urged that the employee attempt to resolve his complaint informally by discussing it with his immediate supervisor. If the department head learns of the problem and considers it serious, he may in his discretion call for a hearing at this time to make certain he has all the relevant information to resolve the dispute or on which to justify any employee reprimand. If the problem is not resolved to the satisfaction of the employee by informal discussion or a de-

4. Albuquerque, N. M., Merit System Ordinance No. 11–1972, § 23 (Jan. 3, 1972). Regulations implementing the grievance and appeal procedure are found in City of Albuquerque Personnel Regulations §§ 900 to 970 (Feb. 1, 1972).

partmental hearing, the employee may file a written grievance with the city manager.[5] If the complaint stems from an action by the employee's department head the grievance must be filed within 10 days of the action that caused the grievance.[6] A hearing by a Grievance Committee is held within seven days after the grievance is filed with the city manager. The committee is composed of three city employees, two appointed by the city manager and one selected by the city manager from a group of three employees chosen by the grievant. Within five days following the hearing the Committee makes a written recommendation to the city manager, who reviews the recommendation and may approve, disapprove, or modify it. The city manager's decision may be appealed to the Personnel Board by giving notice to the city personnel director within 10 days of the city manager's decision. The Personnel Board must hold a hearing within five to 15 days and thereafter within seven days issue a decision. This is the final administrative step in the grievance procedure. In the hearings at each step the grievant may have counsel, present all relevant evidence and confront and cross-examine witnesses.

42 U.S.C.A. § 2000e–5(c) provides that a person must initially institute proceedings with the state or local authority which is vested with the power to grant or seek relief from unlawful employment practices or to institute criminal proceedings with respect thereto.[7] The plaintiff has never filed a grievance with the city manager concerning the complaint he now raises. He claims that the city grievance procedure is wholly inadequate to deal with charges of national origin discrimination. But the weight of the evidence is to the contrary. First, the Merit System Ordinance by its own terms prohibits discriminatory practices:

> No employee of the City or person seeking employment with the City shall be appointed, promoted, demoted, removed or in any way favored or discriminated against because of his race, color, sex, age, political or religious opinions or affiliations, national origin or ancestry.

Ordinance No. 11–1972 at § 25(a). Second, there was testimony concerning numerous instances where the grievance procedure was utilized by other employees at the zoo to rectify complaints concerning denials of promotion, being assigned heavy tasks just after returning from sick leave when a doctor ordered light duty, and unwarranted dismissal of a Spanish employee for dating a younger non-Spanish volunteer helper during his off hours. Each of these incidents were raised by plaintiff at trial as examples of discrimination against

---

5. The city now has an elected mayor instead of a city manager. It is presumed the mayor will assume the duties of the city manager under the ordinance.

The ordinance defines a grievance as a formal written complaint of a city employee "concerning actions taken by management which result in loss of pay or seniority or in written or oral reprimand. The definition of a grievance will generally be interpreted broadly." Ordinance No. 11–1972, *supra* note 4, at § 23(b). A grievance could properly be filed on plaintiff's complaints herein.

6. The ordinance inadvertently does not contemplate an employee filing a grievance on an action by a superior other than the department head. Reading the ordinance narrowly, there is no 10 day time limitation where an employee, such as Mr. Padilla, files a grievance as to an action by the

director of the zoo when the zoo is part of the Department of Parks and Recreation.

The 10 day limitation raises an issue of whether an employee will be barred from filing a charge with the EEOC if he has not first filed a timely grievance with the city when required. This question is not presented here because Mr. Padilla has at no time attempted to file a grievance on his discrimination charges.

7. *See* Albuquerque, N. M., Human Rights Ordinance No. 106–1973 (Jan. 27, 1974), which did not become effective until after the alleged discriminatory acts herein. The city Human Rights Board may enter an order to cease violation of the ordinance and seek its enforcement in municipal court. *Id.* at § 6(D). Each violation of the ordinance is punishable by fine and/or imprisonment. *Id.* at § 14.

Spanish employees by Dr. Stringer. Yet these employees were able to resolve their disputes with Dr. Stringer by means of the city grievance machinery. Contrary to plaintiff's claim that the grievance procedure is inadequate, the evidence was that every time an employee filed a grievance some corrective relief was afforded the employee. Third, when plaintiff was denied his promotion from zookeeper I to zookeeper II in January 1973, two other Spanish employees were also denied the job. They both filed a grievance in regard to this denial, and, as a result of a departmental hearing on their complaints, one of the Spanish grievants was given the zookeeper II position in place of the non-Spanish employee Dr. Stringer had chosen. Finally, this is not the typical exhaustion of remedies defense where a party has failed to seek a satisfactory resolution of his dispute with the defendant in an appropriate executive body before suing in the courts. Here, the party which is the alleged discriminator has an established machinery to resolve its own in-house disputes, and it ought to be given a chance to make that machinery work.[8]

Plaintiff relies on the statements of an employee of the city personnel department that the grievance procedure was not suitable for resolving charges of widespread national origin discrimination because department or division heads who are part of the bureaucracy that is being charged with discrimination are the ones who hear the case. However, the defense of exhaustion of administrative remedies goes to the failure of Mr. Padilla to file a grievance and not to the members of the class who are allegedly discriminated against and on whose behalf he is suing. Second, the employee is wrong as to the griev-

ance procedure permitting the alleged discriminator to sit in judgment at the hearings. Dr. Stringer as director of the zoo does not sit as the arbitrator in the departmental hearing, the Grievance Committee, or the Personnel Board. Moreover, the grievant picks three persons, one of whom is appointed by the city manager to the Grievance Committee, and, on appeal to the Personnel Board, none of the grievant's superiors participate in the decision.

Plaintiff maintains that the city grievance procedure is designed for the more "typical" employee grievance rather than charges of national origin discrimination, but the denial of Mr. Padilla's promotion to zookeeper II is a typical grievance. There is nothing fundamentally different between a denial of a promotion because of a lack of needed skills and a denial because a superior dislikes people of the grievant's ethnic origin. Both turn on resolving factual questions of more or less equal complexity.

■■ Plaintiff has failed to exhaust his local administrative remedies as to his Title VII claims against the defendants. This is dispositive of all of plaintiff's claims under Title VII, except that based upon the requirement of a high school degree for certain positions. That requirement was promulgated by the city personnel department under authority duly vested in it and stands as action of the city itself. This differentiates that claim from the rest of plaintiff's claims against the city. Therefore as to that one claim it would be meaningless to require pursuit of the city grievance procedure.

■ As to the 42 U.S.C.A. § 1983 claim against Dr. Stringer individually, plaintiff is not required to exhaust his

---

8. Plaintiff has cited cases that hold a party need not exhaust his remedies under a collective bargaining agreement before initiating his suit under Title VII. Involved here is a city ordinance which has the force of law and is the type of "local law" Congress referred to specifically in 42 U.S.C.A. § 2000e–5(c).

state and local administrative remedies. Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

## III.

Plaintiff seeks to bring this action on behalf of himself and all other individuals of Spanish national origin who were, are, or will be discriminated against in their employment at the Rio Grande Zoo. Prior to trial the claim was conditionally certified as a class action subject to a later determination at the conclusion of the evidence as to whether the requisites of Fed.R.Civ.P. 23 had been satisfied.

■ As a prerequisite to maintenance of a class action, Rule 23(a)(3) requires that there be questions of law and fact common to the class. With the exception of plaintiff's challenge of the job requirement of a high school diploma or equivalent for the zookeeper position, it would be necessary to examine a myriad of facts and circumstances peculiar to each individual's claim in order to determine whether each individual member of the class has been discriminated against in his employment. There has been no showing that the defendants have dealt with the Spanish employees at the zoo with a blanket set of procedures, policies, or practices that were not applicable to all employees. The evidence mainly consisted of a series of isolated incidents of widely varying fact patterns which could be attributed to national ori-

gin discrimination or to other causes. Thus, with regard to the claim of any individual Spanish employee, a conclusion as to one employee in the class is not common or determinative when that issue arises with respect to another employee. There are factual questions essential to the claim of each employee which cannot be resolved within the framework of a class action.[9] With the exception of the educational requirement for the zookeeper job, there is no threshold question in the present suit which, if resolved favorably as to the named plaintiff, will be binding against the defendants as to other members of the asserted class.[10]

■ A determination of the propriety of a class action involving discrimination or otherwise is a matter for the exercise of the discretion of the trial court. Brito v. Zia Company, 478 F.2d 1200, 1204 (10th Cir. 1973).[11]

There is an additional reason why plaintiff's claim for monetary damages cannot proceed as a class action pursuant to Fed.R.Civ.P. 23(b)(3). Subsection (c)(2) of Rule 23 requires that, in the case of all suits proceeding under Rule 23(b)(3) seeking a monetary award, all members of a class must receive the best notice practicable, and none have been notified.

■ Plaintiff's challenge of the high school diploma or equivalent job qualification for the zookeeper position stands

---

9. Winokur v. Bell, 58 F.R.D. 178 (N.D.Ill. 1972); Carlisle v. LTV Electrosystems, Inc., 54 F.R.D. 237 (N.D.Tex.1972); Bailey v. Sabine River Authority, State of Louisiana, 54 F.R.D. 42 (W.D.La.1971); Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970).

10. Plaintiff attempts to justify a finding of a class by characterizing his suit as an "across the board" attack on defendants' discriminatory employment practices, citing Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1124 (5th Cir. 1969). What is decisive here, however, is not how plaintiff casts his

claim in his pleadings or briefs, but what the evidence was at trial.

11. *Compare* White v. Gates Rubber Co., 53 F.R.D. 412 (D.Colo.1971), *and* Smith v. North American Rockwell Corp.—Tulsa Div., 50 F.R.D. 515 (N.D.Okla.1970) (both denying a claimant's attempt to proceed as a class in a civil rights suit), *with* Gutierrez v. Quinn and Company, Inc., 55 F.R.D. 395 (D.N.M.1972), *and* Reyes v. Missouri-Kansas-Texas R.R. Co., 53 F.R.D. 293 (D.Kan. 1971) (permitting plaintiff to proceed with a class action).

on different stead. The job requirement is a policy decision by defendants that is generally applicable to all persons seeking placement or promotion as a zookeeper. Because a substantially larger percentage of the Spanish population do not have high school diplomas and the qualification is said to have no substantial relation to what the position requires, it thus works a covert discrimination against the class of Spanish origin persons who might seek the job. A conclusion as to the validity of the job qualification as to the named plaintiff is also determinative of the claims of all the members of the class. Accordingly, the requirement of commonality of issues is met.

█ Plaintiff also satisfies the numerosity requirement of Fed.R.Civ.P. 23(a)(1) as to his challenge of the high school diploma requirement for zookeeper. The testimony at trial was that the city receives hundreds of applications annually and that these applications are kept in an active file for only six months and are destroyed after two years. Moreover, several witnesses of Spanish origin testified that they did not even bid for the zookeeper position when an opening developed because they knew or were told they had no chance of getting the job because they lacked a high school diploma. In light of the near impossibility of determining who has been adversely affected by the educational requirement, the numerosity requirement is met.

The plaintiff will be permitted to proceed as a representative of a class of present and prospective zoo employees of Spanish descent as to the one issue concerning the zookeeper job qualifications.

## IV.

█ Turning now to the merits of plaintiff's claim against Dr. Stringer individually pursuant to 42 U.S.C.A. § 1983, Mr. Padilla has failed to prove that his Spanish origin was a factor in causing the denial of a promotion to zookeeper II, his transfer to vehicle maintenance as a result of pressure at the zoo, or any other treatment received by him from Dr. Stringer. Statistical evidence was introduced as to the numbers of Spanish surnamed zoo employees and their rates of advancement, discharge, or transfer. These statistics are probative, but not conclusive evidence as to plaintiff's situation. From the time when plaintiff was hired at the zoo to the date of his transfer to vehicle maintenance it was Dr. Stringer who approved his status from temporary to permanent employment, promoted him from night watchman to zookeeper I, and approved four merit increases because he was performing satisfactorily. Moreover, it was Dr. Stringer who recommended that Mr. Padilla not be fired when it was discovered that he had falsely answered a question on his city job application form concerning his criminal record. The reasons given by Dr. Stringer were that the plaintiff was especially good in working with the birds at the zoo and his record was clean for the past twenty-four years. The explanation given by Dr. Stringer for denying plaintiff the promotion to zookeeper II was his limited physical ability because of a shoulder injury and surgery where ability to lift heavy bags of animal feed was required, limited knowledge of the hoof-stock at the zoo, and questionable honesty because of the false representation on his application form.[12] In addition, there was considerable testimony that Mr. Padilla had been involved in the theft of rare bird eggs from the zoo and that he had been abusing his sick leave. Whether these charges were true is not at issue, but what is important is that Dr. Stringer thought them to be true. In light of all the evidence concerning

---

12. These reasons were set forth in an interoffice memorandum to the Personnel Department written in January 1973, before plaintiff filed his charges with the EEOC.

plaintiff's employment record and abilities it cannot be said that the reasons Dr. Stringer gave for denying the promotion were not the real basis for his decision.

As to the plaintiff's complaint that he was forced to transfer out of the zoo, the testimony did not show that Dr. Stringer designed to purposely harass Mr. Padilla to get him to quit the zoo. Rather, what the evidence does display is that Dr. Stringer, whose overriding concern was the zoo, was often a difficult person for whom to work. If any employee, Spanish of non-Spanish, was not performing up to a certain level, Dr. Stringer would not hesitate to let that employee know about it.

## V.

Plaintiff's claim that the high school diploma or equivalent [13] job qualification for zookeeper covertly discriminates against employees of Spanish origin has merit. Census data on Bernalillo County show that requiring a high school diploma as a prerequisite for any position summarily disqualifies a larger percentage of Spanish surnamed people for the job.[14] The high school diploma

13. The following are considered by the city to be the equivalent of a high school diploma:

1. Evidence of a passing score on the General Education Development (GED) Test for the high school level, which means a score of at least 35 on each of the sub-tests and an overall score of 45.

2. Admission to and completion of work other than audit courses in a recognized college.

3. Successful completion of business college work may be substituted for high school work on a year for year basis.

4. Certified equivalent of high school graduation by the State Department of Education, a local school board of high school authorities.

5. Completion of all scholastic requirements except a technical requirement for graduation may be accepted, provided written proof is submitted from the high school.

6. Evidence of completion of high school by home study with a correspondence school recognized by the Accrediting Commission of the National Home Study Council. When study has been completed with other correspondence schools, evidence from a local high school that they accept the work must be presented.

7. Evidence of the equivalent of high school education completed in another country, acceptable to a local high school. Other evidence will be reviewed and evaluated by the Personnel Director on an individual basis.

City of Albuquerque Personnel Regulations, unnumbered procedures following §§ 100 to 140 (Feb. 1, 1972).

14. The following statistics for Bernalillo County were compiled from Dept. of Commerce, General Social and Economic Characteristics of New Mexico (1970):

| | Total | White | Negro | Indian | SSA | Other |
|---|---|---|---|---|---|---|
| Population Distribution | 315,774 | 176,969 | 6,689 | 5,839 | 123,841 | 2,463 |
| Percentage Distribution | 315,774 | 56.0% | 2.1% | 1.8% | 39.2% | 0.7% |

| | Median School Years Completed: Males | Percent High School Graduates: Males | Median School Years Completed: Females | Percent High School Graduates: Females |
|---|---|---|---|---|
| Total Population 25 or Over | 12.6 | 67.4% | 12.4 | 65.1% |
| Spanish Surnamed American 25 or over | 11.4 | 46.0% | 10.9 | 41.8% |

requirement was first instituted by the personnel department in September 1972, following Dr. Stringer's urging and recommendation.[15] His action was in part a response to directions from the United States Department of Agriculture under the Animal Welfare Act of 1970, 7 U.S.C.A. § 2131 et seq., to upgrade zoo personnel. The USDA initially refused to license the zoo and placed it on probationary status. The zoo was not licensed because the USDA found that there were an inadequate number of employees and existing employees were inadequately trained in animal care.[16] The zoo also responded to the USDA mandate with the zookeeper training program and higher salary grades for zookeepers.

There was evidence that any person of normal intelligence could perform the duties of a zookeeper, since the principal requirements are a love for animals, a willingness to learn more about the animals one is assigned to care for, communicative skills so that one can relate to the public, ability to read regulations and write animal reports, and good physical condition. While some education might be necessary for some of the requirements, the evidence in the case does not establish that a high school diploma is related or necessary to these job requirements.[17] Indeed, there was

---

15. The city's job description for zookeeper I & II drafted in September 1972 is as follows:

Position Title: Zookeeper I, II
Date Prepared: 9/1/72
Applicable to: Zoo
GENERAL STATEMENT OF DUTIES
Under the direction of the Zoo Headkeeper will clean and maintain animals and their quarters.
TYPICAL DUTIES:
1. Observes animals for unusual behavior that may indicate sickness, in pen and birth, etc.
2. Maintains, disinfects and repairs animal quarters and surrounding areas as required.
3. Prepares diets, fees and waters animals in and around existing quarters.
4. May assist veterinarians in minor operations or related activity.
5. Any related tasks, as required.
QUALIFICATIONS
Requires a high school graduate or equivalent with general knowledge of animals and animal behavior. Must have six (6) months experience working with the public.
There was testimony that since September 1, 1972, the zookeeper II job has changed so as to require greater writing, reading and leadership skills than the zookeeper I position. However, a new job description for zookeeper II has never been drafted.

16. Regulations promulgated pursuant to the Animal Welfare Act of 1970 pertaining to

employee skill requirements at a zoo are as follows:

Subpart D—Specifications for the Humane Handling, Care, Treatment, and transportation of Non-human Primates.

.    .    .    .    .

§ 3.82 Employees. A sufficient number of employees shall be utilized to maintain the prescribed level of husbandry practices set forth in this subpart. Such practices shall be under the supervision of an animal caretaker who has a background in animal husbandry or care.

.    .    .    .    .

Subpart E—Specifications for the Humane Handling, Care, Treatment, and Transportation of Warmblooded Animals other than Dogs, Cats, Rabbits, Hamsters, Guinea Pigs, and Non-human Primates.

.    .    .    .    .

§ 3.107 Employees. A sufficient number of adequately trained employees shall be utilized to maintain the professionally acceptable level of husbandry practices set forth in this subpart. Such practices shall be under a supervisor who has a background in animal care.
9 C.F.R. §§ 3.82, 3.107. The regulations were drawn so as not to require any educational degrees.

17. Even the American Association of Zoological Parks and Aquariums, which defendants submit should be considered as an authority, does not suggest a high school diploma requirement as a necessity. Their recom-

**506**

evidence that several employees and volunteers at the zoo who had not finished high school have successfully performed the tasks of a zookeeper.

In Griggs v. Duke Power Co., 401 U. S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court struck down an employer's requirements of a high school diploma or passing of an intelligence test as a condition of employment in or transfer to jobs at a power generation plant. The requirements were found not to be reasonably related to the ability to learn or perform the skills needed in a specific job or category of jobs, and accordingly operated invidiously to discriminate against the black race.

Here, as in *Griggs,* the rights of peoples of Spanish origin require the elimination of arbitrary and unnecessary barriers to employment that cannot be shown to have a significant relationship to job performance. *See* Brito v. Zia Company, 478 F.2d 1200 (10th Cir. 1973). The city and Dr. Stringer may have had no intention to discriminate against Spanish employees when they promulgated the high school diploma or equivalent qualification. However, on the basis of the evidence presented in this cause, the requirement must fall as one that differentiates on the basis of national origin rather than requisite skills. *Griggs, supra,* 401 U.S. at 432, 91 S.Ct. 849. This does not mean that such a requirement might not be properly and sufficiently validated by a proper study at a later time.

Accordingly, a judgment shall be entered enjoining defendants from continuing to require a high school diploma or equivalent for placement in the zookeeper I and II positions at the Rio Grande Zoo, and judgment shall otherwise be entered for the defendants.

mended zookeeper educational qualifications are as follows:

    *Education:* High school or the equivalent is required by most zoos, but not an absolute necessity. A Trainee should be able to read written instructions, write clear reports and requisitions, and fill out the zoo records and forms.
American Ass'n. of Zoological Parks and Aquariums, Zookeeper Training, A Suggested Guide for Instructors, 3 (1968).